## AFFIDAVIT OF RYAN LANE IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Ryan Lane, being duly sworn, state:

### Introduction

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. I am currently assigned to a squad that investigates economic crimes, including fraud and other white-collar crimes. I have bachelor's and master's degrees in accounting and am a Certified Public Accountant.

2. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3. I submit this affidavit for the limited purpose of establishing probable cause to support a criminal complaint charging RAYMOND K. MONTOYA with wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

4. The facts in this affidavit come from my personal involvement in this investigation, interviews with witnesses, and my review of documents, records, and information provided by others, including the Massachusetts Securities Division. This affidavit does not contain every fact learned during the investigation in this case, but only the information needed to support issuing the complaint.

### Background

5. RAYMOND K. MONTOYA ("MONTOYA") is a 69-year old male who resides in Allston, Massachusetts.

6. RESOURCE MANAGED ASSETS, LLC ("RM ASSETS") is a Delaware LLC with a principal place of business located at 175 Federal Street, Suite 910, Boston,

Massachusetts 02110. According to the Delaware Division of Corporations, RM ASSETS executed a Certificate of Formation on August 2, 2007.

7. RMA STRATEGIC OPPORTUNITY FUND, LLC ("RMA FUND") is a Delaware LLC with a principal place of business located at 175 Federal Street, Suite 910, Boston, Massachusetts 02110.[1]

## The RMA FUND

8. Beginning by at least 2009 and continuing until at least June 2017, MONTOYA managed and operated the RMA FUND, a pooled investment hedge fund based in Boston, Massachusetts.[2] For the most part, the individuals who invested with MONTOYA and the RMA FUND (collectively, "the Victims") were either family, friends, or indirect acquaintances of MONTOYA, who resided in Massachusetts, Ohio, and California, among other places, and who learned of the RMA FUND through each other and through word-of-mouth. Under the terms of its operating agreement, the RMA FUND was purportedly only available to investors with a net worth of $2 million or more. However, MONTOYA frequently waived this restriction for family and friends.

9. Through the RMA FUND's updates and written statements to prospective investors, MONTOYA claimed that the RMA FUND had a cumulative rate of return substantially higher than that of the Standard & Poor's 500 stock index ("S&P 500"). Among other

---

[1] According to the Delaware Division of Corporations, the RMA FUND executed a Certificate of Formation on May 16, 2007, creating the RMA GALLEON FUND, LLC. On October 23, 2009, MONTOYA executed a Certificate of Amendment changing the name of the company to RMA STRATEGIC OPPORTUNITY FUND, LLC.

[2] RM ASSETS, of which MONTOYA was the primary manager, was also listed as a managing member of the RMA Fund. MONTOYA maintained an operating account at Citizens Bank under the name RM ASSETS.

things, MONTOYA claimed that the RMA FUND had proprietary algorithm software that enabled the RMA FUND to predict minute-to-minute price movements in securities.

10. MONTOYA claimed in the RMA FUND's written promotional materials to have hired an outside auditor to ensure the financial integrity of the RMA FUND.

11. In order to invest in the RMA FUND, MONTOYA directed the Victims to transfer their funds to an account at Citizens Bank in the name of RMA GROUP, INC ("the RMA Fund Citizens Account"). Beginning by at least 2009 and continuing until at least May 2017, the Victims transferred millions of dollars of their personal savings, and rolled over their employee 401(k) retirement plans to the RMA Fund Citizens Account.

12. After making an investment, MONTOYA and the RMA FUND then sent out monthly statements—through the mail and e-mail—to the Victims that purported to reflect the current value of their investment accounts.

### The Scheme to Defraud

13. From at least 2009 and continuing until at least June 2017, MONTOYA devised and executed a scheme to defraud the Victims of millions of dollars they invested in the RMA FUND.

14. In documents provided to investors, MONTOYA claimed that he traded the RMA FUND's assets using a brokerage account at "J.P. Morgan, New York." Based on my investigation, however, I have been unable to find any evidence that such an account ever existed. Instead, MONTOYA and the RMA FUND had active brokerage accounts at E*Trade Securities LLC ("E*Trade"). The E*Trade account in the name of the RMA FUND was only opened in 2015. Prior to 2015, MONTOYA traded in a brokerage account at E*Trade held in his and his wife's name.

15. Furthermore, while MONTOYA told the Victims that he would invest their money in stocks and bonds, MONTOYA only invested a portion of the Victims' money, while diverting the rest—totaling millions of dollars—to business and personal bank accounts he controlled, and using that money for personal expenses such as luxury vehicles and the mortgage on his son's personal residence.

16. For example, based on a review of bank records, between December 28, 2016 and February 28, 2017, while MONTOYA received over $3 million of investor funds into the RMA Fund Citizens Account, only approximately $1.8 million was transferred to any of the RMA FUND's E*Trade brokerage accounts and invested. During the same period, MONTOYA used more than $1 million of this new investor money (1) to pay over $600,000 in redemptions to earlier investors, (2) to fund approximately $420,000 in checks to MONTOYA's sons and MONTOYA's spouse, and (3) to pay approximately $8,900 to his home equity line of credit.

17. While MONTOYA told the Victims that the RMA FUND was achieving a positive rate of return that exceeded that of the S&P 500, in fact, by approximately 2012, the RMA FUND was incurring losses. By 2015 and 2016, the fund's losses were substantial.

18. In furtherance of his fraud scheme, MONTOYA fabricated account statements and related documents in order to lull investors into a false sense of security about the status of their investments. MONTOYA caused these fabricated account statements to be mailed and e-mailed to the Victims.

### RMA FUND Investor Victims

19. Victim 1 resides in Ohio. Victim 1 first invested with MONTOYA and the RMA

FUND in approximately 2009, and continued to invest into 2017 for a total investment of over $13 million. Victim 1 received literature from MONTOYA stating that the RMA FUND was invested in Australian bonds, large capitalization stocks that paid dividends, gold, general obligation bonds, alternative energy ventures, cash instruments, investment grade corporate bond exchange-traded funds ("ETFs"), and preferred-stock ETFs. According to Victim 1, MONTOYA explained to Victim 1 that half of the fund was invested in stocks and half in bonds. According to Victim 1, MONTOYA said that the fund had approximately $4 billion in assets under management.

20. In fact, the RMA FUND's assets under management were substantially less. While investigators are still in the process of reviewing records, the total amount of assets that MONTOYA managed appears to have been less than $100 million.

21. Victim 1 received monthly statements from MONTOYA showing growing balances and made additional investments in the fund over the years. In fact, MONTOYA had fabricated Victim 1's account balances, and misappropriated at least $1 million of Victim 1's investment.

22. For example, on or about August 19, 2014, MONTOYA deposited four checks totaling $1,036,147.88 from Victim 1 into the RMA Fund Citizens Account. Prior to the deposit of these four checks, the total account balance for the RMA Fund Citizens Account was approximately $127,083.48.

23. The next day, MONTOYA withdrew $1,000,000 from the RMA Fund Citizens Account and opened two personal bank accounts in his and his wife's name, ending

in 2213 and 2221 ("CITZ-2213" and "CITZ-2221") with a deposit of $500,000 into each new account. On or about August 28, 2014, CITZ-2221 had one additional deposit of $25,222.51 and CITZ-2213 had an additional deposit of $25,000.48. Other than these two deposits, the only other transactions in CITZ-2213 and CITZ-2221 (other than nominal monthly account interest payments) were transfers to and from the RMA Fund Citizens Account and to and from an RM ASSETS operating account at Citizens Bank ending in 3241 ("RM Assets Operating Account"). Besides these inter-account transfers, there were no withdrawals from either CITZ-2213 or CITZ-2221 until approximately February 2015.

24. On or about October 27, 2014, MONTOYA transferred $900,000 from CITZ-2221 to the RMA Fund Citizens Account and $275,000 from CITZ-2213 to the RMA Fund Citizens Account. The next day, on or about October 28, 2014, MONTOYA wired $1,003,212.64 from the RMA Fund Citizens Account to JP Morgan Chase Bank to pay off a mortgage for his son and daughter-in-law.

25. Victim 2 resides in California. In or about July 2016, Victim 2 invested approximately $200,000 with MONTOYA and the RMA FUND. After Victim 2's initial investment, Victim 2 invested another $25,000 with MONTOYA and the RMA FUND in or about February 2017.

26. According to Victim 2, MONTOYA purchased airline tickets to fly Victim 2, and others, to Boston to visit the RMA FUND's office. MONTOYA also paid for them to stay in a hotel in Boston during their visit.

27. According to Victim 2, MONTOYA said that the RMA FUND had proprietary investment software and, during a tour of the office, gave a demonstration of how the

software worked. MONTOYA told Victim 2 that the software could correctly predict stock price changes with about 65 percent accuracy.

28. In fact, MONTOYA and the RMA FUND never had any type of proprietary investment software. Furthermore, by at least 2015 and 2016, the RMA FUND was incurring substantial losses that MONTOYA concealed from Victim 2 and the other Victims.

29. Victim 3 resides in Ohio. Victim 3 first invested with MONTOYA and the RMA FUND on or about June 29, 2016, and continued to invest into 2017 for a total investment of approximately $813,000.

30. According to Victim 3, MONTOYA met with Victim 3 twice at Victim 3's residence. Victim 3 further stated that MONTOYA called and texted Victim 3 and reassured Victim 3 about the status of Victim 3's investment. For example, prior to one of MONTOYA's face-to-face meetings in approximately November 2016, MONTOYA falsely assured Victim 3 via text message that "We gained 3.01% in Oct. [and] had some lucky trades during the earnings season." In fact, by 2016, the RMA FUND was incurring substantial losses.

### Consensual Interview of MONTOYA

31. During a consensual interview with law enforcement on June 12, 2017, MONTOYA admitted to defrauding investors of the RMA FUND and covering up substantial losses that the RMA FUND incurred beginning in 2015. MONTOYA stated that in 2012 and 2013, the RMA FUND was breaking even and then incurred mild losses, and that by 2015 and 2016, the RMA FUND was suffering substantial losses.

32. Despite these losses, MONTOYA said he falsely told investors that they were earning modest returns. MONTOYA said he fabricated higher returns on the monthly statements

he provided to investors because he feared he would lose investor subscriptions and investors would pull their money out of the RMA FUND. MONTOYA admitted that he paid redemptions to earlier investors using money invested by subsequent investors.

33. MONTOYA further admitted that around 2014 he started to use investor funds for personal expenses, including travel, the purchase of numerous high-end vehicles, tuition for his children, and the mortgage on his son's residence in Illinois.

34. In addition, MONTOYA admitted that the RMA FUND never had any type of proprietary investment software, and that there was never any outside audit of the RMA FUND.

**Conclusion**

35. Based on the foregoing, I submit there is probable cause to believe that RAYMOND K. MONTOYA committed the crimes of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

_____
Ryan Lane
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this 1st day of August 2017, at Boston, Massachusetts.

_____
HON. MARIANNE B. BOWLER
United States Magistrate Judge
District of Massachusetts