UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.<br>)<br>RAYMOND K. MONTOYA, )<br>)<br>Defendant. ) | 18-cr-10225- GAO-1 |

## POSITION OF DEFENDANT WITH RESPECT TO SENTENCING

Christopher Bruno, Esq.<br>
Bruno & Degenhardt, P.C.<br>
10615 Judicial Drive, Suite 703<br>
Fairfax, Virginia 22030<br>
<em>Lead Counsel</em><br>
<br>
Todd J. Bennett, Esq.<br>
Massachusetts Bar No. 643185<br>
Bennett & Belfort, P.C.<br>
24 Thorndike Street, Suite 300<br>
Cambridge, MA 02141<br>
<em>Local Counsel</em>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                              |   |                     |
|------------------------------|---|---------------------|
| UNITED STATES OF AMERICA     | ) |                     |
|                              | ) | 18-cr-10225- GAO-1  |
| v.                           | ) |                     |
|                              | ) |                     |
| RAYMOND K. MONTOYA,          | ) |                     |
|                              | ) |                     |
| Defendant.                   | ) |                     |

**POSITION OF DEFENDANT WITH RESPECT TO SENTENCING**

Defendant Raymond K. Montoya ("Mr. Montoya"), through the undersigned counsel, submits this sentencing memorandum in connection with his sentencing scheduled for March 21, 2019.[1]

On October 17, 2018, Mr. Montoya pled guilty to Counts One through Ten of the above-captioned Criminal Information, charging Wire Fraud in violation of 18 U.S.C. § 1343, Mail Fraud in violation of 18 U.S.C.§ 1341 and Unlawful Monetary Transactions in violation of 18 U.S.C. § 1957. Mr. Montoya's offense conduct directly stems from his role in managing and operating RMA Strategic Opportunity Fund, LLC ("RMA Fund"), a pooled investment hedge fund based in Boston, Massachusetts.

Throughout the course of the scheme to defraud, Mr. Montoya raised approximately $38,000,000 from unsuspecting victims who had invested their hard-earned savings. As part and parcel of the scheme, Mr. Montoya returned approximately

---

[1] Pursuant to Rule 32, Federal Rules of Criminal Procedure and Section 6A1.3 of the United States Sentencing Guidelines ("U.S.S.G."), Mr. Montoya hereby acknowledges that he has received and reviewed both the initial Presentence Report and the subsequent revised report thereto (collectively "the PSR") prepared in this case.

2

$26,000,000 to investors prior to the detection/discovery of his illicit conduct.[2] At the time of sentencing, Mr. Montoya will have additionally returned approximately $11,300,000 in "post-detection/cooperation" funds for eventual distribution to the victims of his fraud.[3] Mr. Montoya is also aiding in efforts to "claw back" approximately $9,707,821 in "excess payments" that were made to certain investors for redistribution to the victims.[4]

Most importantly, Mr. Montoya fully appreciates the fact that his criminal activity resulted in serious and widespread harm to numerous unsuspecting victims in this blatant scheme to defraud. It is equally clear to Mr. Montoya that the reprehensible nature of his conduct is underscored by the fact that the vast majority of his victims were close friends and acquaintances who were particularly susceptible to being duped by someone that had garnered their personal trust.

Mr. Montoya has always accepted unequivocal responsibility for his conduct and he knows that he alone must face the consequences of his actions. Mr. Montoya has never sought to minimize his conduct or deflect blame onto others. Rather, he unequivocally

---

[2] Pursuant to the plea agreement filed in this case, the parties disagree over whether any portion of the returned funds should be deemed "a credit against loss" for advisory guideline purposes. As discussed below, we submit that approximately $16,269,872 should be credited against loss in accordance with USSG § 2B1.1(b) and the relevant Application Notes. The parties also disagree over the applicability of USSG § 2B1.1(b)(10)(C) (Sophisticated Means) and our position regarding this enhancement is also discussed below.

[3] We recognize, as we must, that the return of these post-detection/cooperation funds cannot be credited against the loss caused in this case. However, we will address below the return of these funds for the Court's consideration in the context of our § 3553 position.

[4] Once again, we recognize that any successful recapture of these funds cannot be used to reduce the loss calculation in this case. However, Mr. Montoya's efforts in this regard will serve to effectuate a more equitable distribution of available funds amongst the RMA Fund victims.

acknowledges that he engaged in the offense conduct described in the PSR with his "eyes wide open" and that every step of the way, he knew that what he was doing was not only illegal, but also morally wrong. Moreover, as we believe will become readily apparent to the Court during the sentencing hearing, Mr. Montoya deeply regrets the financial and emotional harm that his conduct has inflicted on the victims, and their families.

In light of Mr. Montoya's acute sense of accountability, steadfast sense of remorse and shame, and in conjunction with other factors discussed in detail below, we respectfully request that the Court impose an ultimate sentence that is in accordance with the overriding principle of 18 U.S.C. §3553(a) requiring a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing goals set forth in the Act. In light of these and other factors, we respectfully submit that a substantial departure from the low-end of the advisory guideline range would be in accordance with the purposes of sentencing as delineated in the Act.

## **OFFENSE CONDUCT**

Mr. Montoya managed and operated the RMA Fund from 2009 to early June 2017. Mr. Montoya was the "face" of the RMA Fund and he was solely responsible for all significant aspects of the venture's operations.

Despite his role as an "investment advisor," Mr. Montoya had no formal training in the securities industry. Mr. Montoya initially began trading securities in 1996, with funds provided by his father-in-law and he was, for the most part, a successful day trader until the market crashed in 2001.

In about 2003, with approximately $500,000 remaining in his trading account, Mr. Montoya decided to employ a different trading strategy; one not dependent on pure

speculation in securities, requiring rapid buying and selling within the same trading day, but rather, one based upon the purchase of select securities that would be held for an extended period of time. After learning of Mr. Montoya's new trading plan, a number of family members and close friends decided to provide him with additional funds so that he could exponentially maximize his trading efforts, while at the same time employ certain hedge strategies to minimize risk. Some of the individuals who provided initial funding to Mr. Montoya eventually participated in the RMA Fund and suffered significant losses as a result of his conduct.

Surprisingly, from 2003 until 2007, Mr. Montoya's conservative trading strategy was a success, reaping trading profits for him and for those who funded his trading activities. In 2007, fueled by his trading success and a growing, but unfounded sense of self confidence, Mr. Montoya created a formal hedge fund in order to attract new investor funds. From 2007 through 2009, Mr. Montoya continued to earn trading profits for his investors. Taking it a step further, in 2009, Mr. Montoya created the RMA Fund in order to comply with registration requirements that would enable him to properly recruit additional investors from different jurisdictions, notably, California, Ohio and Massachusetts.

From 2009, and continuing through approximately 2012, RMA Fund continued to be a successful investment vehicle for the pooled investors. Despite the fund's success during this period of time, the RMA Fund was premised upon Mr. Montoya's current offense conduct. No longer satisfied with relying on his rather fortunate trading success to date, Mr. Montoya consciously employed a series of material misrepresentations and significant omissions designed to entice a larger number of investors to his fund.

Specifically, Mr. Montoya affirmatively represented to potential investors that his fund would invest in safe, low risk securities; instead, he purchased volatile, high risk/high yield securities issued by biotechnical companies. In addition, he further deceived investors about the amount of money the RMA Fund had under management, its use of proprietary trading software and the retention of an independent auditor.

From some point in 2012 and continuing through 2014, Mr. Montoya's luck began to turn and the RMA Fund began to suffer losses, or at best was breaking even. By 2015 and 2016, the fund's losses were substantial. Despite these mounting losses, Mr. Montoya believed he could "trade his way" out of the deficit. Throughout this period, Mr. Montoya created false account statements in order to effectuate the purposes of his scheme. In any event, by 2017, the RMA Fund finally imploded.

## ACCEPTANCE OF RESPONSIBILITY

In early June 2017, the Massachusetts Securities Division began an investigation into the RMA Fund. Shortly thereafter, on June 6, 2017, Mr. Montoya directed counsel to contact the Government in order to provide a brief overview of the fraud, express his intent to accept complete responsibility for his conduct and to schedule an interview session. On June 8, 2017, the state regulator filed a civil injunctive action against Mr. Montoya and related RMA Fund entities.

On June 12, 2017, Mr. Montoya was interviewed by the Government. During the course of this in-depth interview session, Mr. Montoya fully disclosed his role in the scheme and he did so without the benefit of any evidentiary use limitations or restrictions which would serve to limit the Government's use of his statements in the future. The fact that Mr. Montoya agreed to provide inculpatory statements to law enforcement without

the protection of a *Kastigar* letter, in conjunction with his decision to self-report his conduct to the Government, further highlights his unbending commitment to be held accountable for his actions.

Throughout the interview session, Mr. Montoya's goal was to be truthful and forthcoming, and he never sought to minimize his role in the fraud scheme. In an effort to provide as much information as possible, Mr. Montoya did not merely endeavor to respond in a cursory fashion to isolated questions; rather, he looked to the context of the specific line of questioning – the spirit of the question – in order to be as over inclusive as possible. It is respectfully submitted that Mr. Montoya's statements during the interview session were in fact truthful, decisive and made without hesitancy.

During the interview session, in addition to admitting that the RMA Fund suffered large trading losses, Mr. Montoya readily informed the Government of his illicit use of the proceeds provided by investors. More specifically, Mr. Montoya admitted that the vast majority of the misappropriated funds were used for numerous vehicles, the payment for medical school loans for his children and the retirement of a $1,000,000 mortgage on his son's home in Chicago.

Most importantly, Mr. Montoya identified all of RMA Fund's existing trading and bank accounts. Without the necessity of acquiring a formal freeze order, the Government accepted Mr. Montoya's representation that he would protect the funds in the accounts and not dissipate any other assets until the accounts could be eventually transferred to the U.S. Marshall's Service for liquidation and direct disbursement to the victims. Mr. Montoya also assured the Government that the $1,000,000 used in connection with his son's mortgage would be transferred directly back to the U.S. Marshalls.

7

To date, approximately $9,400,000 has been transferred directly to the Government, comprised of $8,300,000 in the RMA Fund trading account, other funds in the entity's bank accounts, the forfeiture of a number of vehicles sold at auction and $400,000 associated with the payment for his son's mortgage.

On August 8, 2017, the Government filed a Criminal Complaint against Mr. Montoya in this district. On October 19, 2017, the U.S. Bankruptcy Court appointed a Chapter 11 Trustee for the RMA Fund and liens were ultimately placed on identified real estate. Consequently, Mr. Montoya's continued return of assets, for the most part, must be effectuated under the auspices of the trustee. Currently, the trustee has reached settlements with Mr. Montoya and a number of his family members for the payment of approximately an additional $1,100,000. Bank loans secured by various pieces of real estate have been approved to fund these settlements, including the remaining amount owed in connection with his son's home in Chicago. In addition to the surrender of the value of other vehicles prior to sentencing and the estimated value of other items seized by the Government, Mr. Montoya will have returned approximately $11,300,000 of post-detection/cooperation funds for disbursement to the victims in this case.

From the outset, Mr. Montoya has offered his assistance to the trustee to "claw back" approximately $9,707,821 in "excess payments" that were made to certain investors for redistribution to the victims. We have recently learned that the trustee is now focused on this aspect of the bankruptcy proceeding and he will be seeking Mr. Montoya's cooperation.

## PERSONAL BACKGROUND

Mr. Montoya is seventy-one years old and was born in the Philippines. As reflected in the PSR, he was raised by both parents in a loving and caring home. Nonetheless, as a young man of twenty, Mr. Montoya came to this country in search of a better life. Four years after arriving in this country, he met and married his wife, Alama. The couple have been married for forty-seven years and raised four highly successful children, three of whom are physicians.

The Montoyas are an extremely close-knit family and remain supportive of Mr. Montoya despite the nature and degree of his underlying offense conduct. It is abundantly clear that Mr. Montoya is devoted to his family, friends and church community. For many years, preceding the detection of the offense conduct, Mr. Montoya and his family have given freely of their time to their church and its parishioners. Moreover, as many will attest, Mr. Montoya would never hesitate to assist a family member, friend or fellow member of his church community in a time of need. Mr. Montoya believes, almost to a fault, that he can resolve any problem encountered by others simply because he cares so much.

Unfortunately in 1988, while residing in California with his family, Mr. Montoya ran afoul of the law. During this period of time, while employed by a local company, Mr. Montoya became aware that the CEO was diverting corporate funds for his own use. Seeing the relative ease in which this theft was accomplished, Mr. Montoya engaged in the identical conduct in an independent scheme. Thereafter, Mr. Montoya admitted to the Board of Directors his own misconduct and that of the CEO. Mr. Montoya ultimately

pled guilty to Grand Theft and eventually returned all of the misappropriated funds. In addition, Mr. Montoya cooperated in the SEC's investigation concerning the CEO.[5]

In 1992, Mr. Montoya's daughter was accepted to Boston University. Unable to afford the requisite room and board, the family relocated to the Boston area so that she could commute to school from home. At the time the Montoyas relied on welfare and financial aid, as Mr. Monttoya struggled to provide for the family. Finally, as noted earlier, in 1996, Mr. Montoya opened a trading account with funding from his father-in-law to engage in day trading.

Since the family's relocation to the Boston area, almost thirty-years ago, Mr. Montoya has been devoted to the wellbeing of his children and members of his church. Mr. Montoya currently volunteers on a full-time basis at his church.

As noted in the PSR, Mr. Montoya suffers from ongoing depression as a result of his acute awareness of the harm that he has caused his victims. In order to combat his depression, Mr. Montoya frequently abuses alcohol as a method of self-medication. He is currently under the care of a psychiatrist and is being proscribed anti-depression medication.

## ARGUMENT

As a preliminary matter and as stated in the plea agreement, the parties reserved the right to make certain arguments at sentencing concerning the application of specific factors comprising Mr. Montoya's total offense level under the advisory sentencing guidelines. In this regard, Mr. Montoya has agreed not to oppose the Government's position that, pursuant to USSG § 2B1.1(b) (2) (B-C), his offense level should be

---

[5] As noted in the PSR, Mr. Montoya's prior conviction in 1988, did not result in the addition of any criminal history points.

increased by a total of 4 levels (as opposed to 2 levels) because the offense resulted in substantial financial hardship to 5 or more victims. In addition, the Government has agreed not to take the position that Mr. Montoya's offense level should be increased by an additional 2 levels for his role in the offense pursuant to USSG § 3B1.1(c).[6]

On the other hand, the plea agreement also contains references to the contested issues that are integral to accurately calculating the advisory guidelines: the parties' divergent positions regarding the appropriate "loss calculation" and the application of a 2 level increase for sophisticated means.

1. <u>Certain Repayments of funds to investors constitute a credit against loss.</u>

The Government has taken the position that Mr. Montoya's offense level should be increased by 22 levels because the loss attributable to his conduct is more than $25,000,000. Mr. Montoya maintains that that his offense level should be increased by only 20 levels because the total amount of loss should be reduced by certain repayments of principal that he made to investors over the course of the scheme.

As we understand the Government's position and as also stated in the PSR, the amount of loss for guideline purposes should be $38,000,000, corresponding to the total amount of funds raised by the RMA Fund from investors. In essence, the Government's view is that all repayments of principal made during the course of a Ponzi scheme are done to perpetuate the fraud, and should not be deemed a credit against loss. The Government's position is based on an overly broad view of a Ponzi scheme, ignores the

---

[6] Mr. Montoya has always maintained that he was the only culpable individual involved in the fraud. Mr. Montoya's position is corroborated by the existence of the undisputed facts pertaining to the scheme.

plain language of relevant Application Notes and is grounded upon case law that pre-dates the 2001 amendments that promulgated the new Application Notes.

We respectfully submit that Mr. Montoya's payments of principal prior to the detection of the fraud should be deemed a credit against loss. Mr. Montoya's argument is based squarely on the text of the guidelines and application notes, and a sound body of relevant decisional authority.

As a starting point and in accordance with U.S.S.G. § 2B1.1(b)(1), the loss figure attributable to any fraud is the greater of either the actual loss or the intended loss. From the Government's perspective the intended loss in this case is $38,000,000. However, U.S.S.G. § 2B1.1, Application Note 3 (E), "Credits Against Loss," requires that the "[l]oss shall be reduced by … [t]he money returned…. By the defendant… to the victim before the offense was detected."

Based upon Application Note 3 (E), the parties agree that the funds Mr. Montoya has returned subsequent to the detection of the offense during his efforts to cooperate shall not be deemed a credit against loss. Consequently, the approximately $11,300,000 expected to be returned to investors does not result in a reduction of the $38,000,000 raised by the RMA Fund.

Nevertheless, based on the text of this guideline, Mr. Montoya should receive a credit against loss in this case. *United States v. Snelling*, 768 F.3d 509, 513, (6th Cir. 2014) (a credit against loss is persuasive based upon the text of this guideline alone). Moreover, Mr. Montoya's argument is further bolstered by U.S.S.G. § 2B1.1, Application Note 3 (F) (iv), which specifically addresses loss calculations in Ponzi and other fraudulent schemes. Application Note 3(F) states that, when calculating the loss figure in a fraud

scheme, including in a Ponzi scheme, the "loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme *in excess* of that investor's principal investment.) (emphasis added).

Here, Mr. Montoya returned $26,000,000 prior to the detection of the fraud. Of this amount approximately $9,707,821 was returned to a number of investors in excess of the principal amount that these investors contributed to the RMA Fund. Consequently, pursuant to the plain language of Application Note 3 (F), this $9,707,821 paid in excess cannot serve as credit against loss. As a result, Mr. Montoya should receive a $16,259,872 ($26,000,000 - $9,707,821 paid in excess of principal) credit against the $38,000,000 amount raised by the fund, resulting in an intended loss amount of $21,750,128 and a corresponding increase of 20 levels for guideline purposes.

The Government's position that there should never be a credit against loss in a Ponzi scheme is based upon the view that all funds returned serve only to perpetuate the fraud. However, this is an overly broad view of Ponzi schemes and neglects to focus on Mr. Montoya's intent in returning the subject funds to investors. While we recognize that there is some equitable appeal to the Government's view in connection with certain Ponzi schemes, not all such schemes are the same.

We submit that a critical distinction should be made between Ponzi schemes that are completely devoid of any underlying business purpose and schemes such as the RMA Fund. We agree that a respectable argument can be made that, despite the clear language of the application notes, a credit against loss should not be allowed in schemes whereby a defendant promises to utilize funds for a particular purpose, but from the inception, never intends to fulfill that promise. In such schemes, the defendants merely take in funds and

later shuffle payments to earlier investors with the hope that the scheme can go on indefinitely. In this instance, it is clear that the defendants' "intended loss" clearly corresponds to the total amount of funds taken from investors during the life of the fraud. See *United States v. Hartstein*, 500 F.3d 790, (8th Cir. 2007) (focus should center on the nature of the Ponzi scheme to determine the issue of intent).

Unlike, the typical Ponzi scheme, the RMA Fund was in fact based on an underlying business purpose, namely to engage in securities trading. In fact, this is precisely what the fund was doing from 2009 through 2017. The fact that the fund had a legitimate underlying business purpose is evidenced by the fact that there was $8,300,000 in the trading accounts at the time the fund ceased to operate in 2017, in conjunction with the fact that the fund suffered heavy trading losses.

Despite Mr. Montoya's general culpable intent in the scheme regarding his affirmative misrepresentations, one thing is certain: throughout the life of the fraud, he did not subjectively intend for the victims to lose all of their money. See *Hairstein* at 799. In fact, he had hoped, however misplaced, that his trading fortunes would change and the victims would not lose their investment. Unlike in other Ponzi schemes, Mr. Montoya did not intend for the victims to lose the total amount of funds raised during the scheme ($38,000,000). Accordingly, Mr. Montoya should receive a $16,269,872 credit for pre-detection funds returned to investors against the $38,000,000 amount raised by the fund, resulting in an intended loss amount of $21,750,128 and a corresponding increase of 20 levels for guideline purposes.

2. <u>Mr. Montoya did not engage in especially complex or intricate offense conduct</u>

Both the Government and the PSR have assessed a 2 level enhancement under U.S.S.G. § 2B1.1(10) (C), based on the notion that "the offense otherwise involved sophisticated means." The Government's rationale for this enhancement is based on the fact that Mr. Montoya issued false account statements to the investors and that, although he worked from his home, he also met investors at the RMA Fund's office in Boston.

Application Note 9(B) defines sophisticated means, as "especially complex or especially intricate offense conduct." The Application Note goes on to provide examples of sophisticated conduct such as "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or off shore financial transactions." *Id*.

In this case there was nothing especially complex or intricate regarding Mr. Montoya's offense conduct. First, he did not use corporate shells, fictitious entities or engage in offshore transactions to avoid detection. Moreover, Mr. Montoya did not hide behind nominees in order to insulate his conduct; in fact, all of the relevant bank and trading records provided a road map which clearly lead back to him and his illicit use of some of the proceeds provided by the investors.

More specifically, his use of fabricated account statements were simply another aspect of the underlying fraud and merely constitute furtive conduct on equal footing with the other affirmative misrepresentations that were put forth from the inception of the scheme. Mr. Montoya used very basic means to commit the underling offense conduct; he simply met with the victims and disseminated misleading materials to provide false assurances about the nature and security of their invested funds. In fact, because the

victims trusted Mr. Montoya and considered him a friend, it was not necessary for Mr. Montoya to engage in "especially complex or intricate" conduct.

The relevant inquiry is not simply whether Mr. Montoya concealed his offense conduct, which is inherent in every fraud scheme, but whether his actions reflect "a greater level of planning or concealment than a typical fraud of its kind. *United States v. Pacheo-Martinez*, 791, F.3d 171, 179 (1st Cir. 2015). At least relative to other cases of investment advisor fraud, Mr. Montoya's conduct does not demonstrate "a greater level of planning or concealment than a typical fraud of its kind, and his offense level should not be increased by 2 levels for sophisticated means.

3. The Court should fashion a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. § 3553.

In light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), the sentencing guidelines are now advisory and as a result, a district court must "consider Guideline ranges," but may "tailor the sentencing in light of other statutory concerns as well." *Id.* at 757. Those factors include (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from future crimes and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

Since June 2017, Mr. Montoya has consistently demonstrated an acute sense of accountability, acceptance of responsibility and remorse for his conduct. Those in close contact with him are particularly aware of Mr. Montoya's single-minded focus on the harm that he has caused to the victims in this case.

It is respectfully submitted that Mr. Montoya has exhibited a level of remorse and acceptance of responsibility that is atypical of those involved in financial fraud schemes. In short, Mr. Montoya's sincere remorse does not mask an underlying regret for failing to avoid detection. In fact it was Mr. Montoya who self-reported and thereafter insisted that a complete picture of his conduct be brought to light and he did so, every step of the way, in the face of serious legal consequences.

It is beyond dispute that Mr. Montoya has never sought to minimize his conduct nor sought to justify his own conduct as a result of past personal hardships. Rather, Mr. Montoya has always fully acknowledged that he engaged in the underlying offense conduct with his "eyes wide open" and that he knew his conduct was not only illegal, but also wrong. In light of his sincere remorse and unique understanding of the harm that he has caused, we are highly confident that, in his remaining years, Mr. Montoya will never run afoul of the law again. More importantly, Mr. Montoya has suffered personally, particularly the sting of disappointing his victims, his family and his fellow church members. In short, Mr. Montoya suffers and will continue to suffer from his ill-chosen decision to engage in the underlying offense conduct.

As detailed above, Mr. Monoya raised $38,000,000 from the victims of this fraud. On the other hand, he returned $16,269,872 in repayments of principal prior to the detection of the fraud. Moreover, he will have returned an additional amount of

approximately $11,300,000 in post-detection/cooperation repayments for the benefit of the victims. Consequently, although on its face, it appears that Mr. Montoya engaged in a $38,000,000 fraud, in fact the victims will have recouped approximately $27,000,000 of the invested funds. Finally, Mr. Montoya will be assisting the trustee in the recovery of approximately, $9,707,821 during his "claw back," for an equitable redistribution to harmed investors.

We respectfully request that the Court take into consideration Mr. Montoya's diligent efforts to marshal assets in order to minimize the financial harm caused to his victims. In addition, we also request that the Court take into consideration Mr. Momtoya's decision to self-report, to be completely honest and truthful with the Government and most importantly, to also preserve assets in the first instance.

We are mindful that the Court must fashion a sentence that would achieve the goals of general deterrence. In this regard, we submit that should the Court fashion a sentence with these above considerations in mind, a powerful message would be conveyed to other defendants that the best course of action is to immediately accept responsibility and to seek to minimize investor harm.

We respectfully submit that a substantial departure from the low-end of the advisory guideline range would result in a sentence that is "sufficient, but not greater than necessary" so as to impress upon Mr. Montoya the significance of his conduct, yet allow him to continue meaningful rehabilitation. Given the personal strides that he has made since his decision to accept responsibility, it is respectfully submitted that such a sentence would serve to provide hope to Mr. Montoya that he still could effectuate meaningful changes, not only in his life, but for the benefit of others.

Conclusion

We respectfully request that the Court impose a sentence that represents a significant departure from the advisory guideline range. We also request that the Court recommend to the Bureau of Prisons that Mr. Montoya be designated to serve his sentence at the federal facility located in Fort Devens, Massachusetts (FMC Devens). Finally, in light of his current alcohol abuse, Mr. Montoya also requests that the Court recommend to the Bureau of Prisons that he be placed in a Residential Drug Program at the facility.

Respectfully submitted,

/s/
Christopher Bruno
Virginia Bar No. 47651
Bruno & Degenhardt
10615 Judicial Drive, Suite 703
Fairfax, VA 22030
Tel: (703) 352-8960
Fax: (703) 352-8930
cbruno@brunodegehardt.com

s/ Todd J. Bennett
Todd J. Bennett, Esq.
Massachusetts Bar No. 643185
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
Telephone: (617) 577-8800
Facsimile: (617) 577-8811
tbennett@bennettandbelfort.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 14th day of March 2019, I electronically filed the foregoing document with the Clerk using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record by means of electronic filing with CM/ECF.

                                             /s/ Christopher Bruno
                                             Christopher Bruno