UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 18-10225-GAO |
| | ) |
| RAYMOND K. MONTOYA, | ) |
| | ) |
| Defendant. | ) |

## UNITED STATES' SENTENCING MEMORANDUM

The Government respectfully submits that this Court should sentence defendant RAYMOND K. MONTOYA ("MONTOYA") to a term of incarceration commensurate with the offense, the harm he caused and his conduct to mitigate the harm after the completion of the offense. While the Defendant asserts that the applicable Sentencing Guideline Range is 135-168 months, the Government maintains that a correct application of the U.S. Sentencing Guidelines, as found by U.S. Probation in the final Pre-Sentence Report ("PSR"), results in an advisory sentencing range of 210-262 months.

### APPLICATION OF THE U.S. SENTENCING GUIDELINES

While the U.S. Sentencing Guidelines ("USSG") are advisory and not mandatory, United States v. Booker, 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [ ] a court should ordinarily begin by calculating the applicable guideline range." United States v. Gilman, 478 F.3d 440, 445 (1st Cir. 2007).

Two tissues need resolution: the total amount of loss and the sophisticated means enhancement. The Government submits that the amount of loss is approximately $38 million (between $25 and $65 million). The Defendant argues that it is less than $25 million. In any event,

1

the Government submits that the Court can find a range of loss for the applicable advisory sentencing guideline range and defer a precise order of restitution until after sentencing. The amount of loss, under the Defendant's own factual analysis, is above $25 million. Otherwise, the parties agree, and the PSR has found a 4-level enhancement for substantial hardship to five or more victims; a 4-level enhancement for acting as an investment advisor; and a 1-level enhancement for his conviction under 18 U.S.C. § 1957(a).

### A.      Amount of Loss – USSG § 2B1.1

The amount of loss is contested in this case. The Government contends the total amount of loss is more than $38 million; the Defendant avers that it is around $21 million. To be sure, "[w]hen a criminal defendant is convicted of a fraud offense, the Sentencing Commission has established amount of loss—generally the higher of actual or intended loss—as a rough proxy for determining the seriousness of the offense and the relative culpability of the offender." United States v. Alphas, 785 F.3d 775, 777 (1st Cir. 2015); United States v. Appolon, 695 F.3d 44, 69 (1st Cir. 2012) ('[t]he district court's intended loss formula was a reasonable proxy for culpability in the circumstances of this case").

A victim of a fraud offense includes any person who sustained "actual loss" in the form of "reasonably foreseeable pecuniary harm." See §2B1.1, comment. (n.1) (defining "victim" to mean "any person who sustained any part of the actual loss"). Likewise, "reasonably foreseeable pecuniary harm" is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." §2B1.1, comment. (n.3(A)(iii)); see also United States v. Stepanian, 570 F.3d 51, 54–55 (1st Cir. 2009). "Pecuniary harm" is simply "harm that is monetary or that otherwise is readily measurable in money." §2B1.1, comment. (n.3(A)(iii)).

Here, the amount of pecuniary harm is measurable based on a victim-by-victim analysis: the total amount of money each victim invested with MONTOYA and the RMA Fund minus any money they received back from MONTOYA either through redemptions or withdrawals. See e.g., United States v. Qazah, 810 F.3d 879, 889 (4th Cir. 2015) ("for the purpose of determining the loss that was intended to result from the offense, *see* U.S.S.G. § 2B1.1 cmt. n.3(A)(ii), the court must identify and focus on the intended victim or victims of the offense").

The amount of loss is contested both factually and legally, but as a factual matter, even under the Defendant's own analysis, the amount of loss is greater than $25 million and results in a base offense level of 29. In any event, the Government can demonstrate by preponderance of the evidence that the total of amount of loss is more than $38 million.[1] See United States v. Sharapka, 526 F.3d 58, 61 (1st Cir. 2008) ("[D]eference is owed" to the loss determination of the district court, which "need only make a reasonable estimate of the loss," because the district court "is in a unique position to assess the evidence and estimate the loss based on that evidence") (quoting USSG § 2B1.1, cmt. n.3).

*The Money the Investor-Victims Gave to MONTOYA and the RMA Fund*

The Government determined the amount of loss by first adding up the total amount of money each individual victim gave to MONTOYA and invested with the RMA Fund. To determine this number, the Government looked at several reliable sources of information.

First, there were the bank records at Citizens Bank of the RMA Fund (the accounts ending in 3241 and 3582). From these records, going back approximately 7 years from June 2017, the

---

[1] The amount of loss is furthermore based not only on the conduct for which a defendant is convicted, but also "relevant conduct" for which he is found responsible by a preponderance of the evidence. United States v. Cox, 851 F.3d 113, 120–21 (1st Cir. 2017); citing United States v. Pennue, 770 F.3d 985, 992-93 (1st Cir. 2014). Under USSG § 1B1.3, relevant conduct includes "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG §1B.3.

Government could see and verify the deposits from investors. Second, the FBI and IRS dealt directly with the victims and collected records documenting their investments with the RMA Fund, especially in the case of earlier investments where records of the transactions were no longer available. Third, the victims submitted answers to detailed questionnaires and engaged in interviews with the FBI and IRS, thus further documenting the money they gave, and any funds they got back.

In comparison, the Defendant's analysis is limited to two bank accounts at Citizens Bank and does not account for the earlier transfers of funds to the RMA Fund and the direct information that the victims provided to the Government. In some instances, the Defendant's analysis indicates that a particular victim invested no money, but nonetheless received a return. For example, while the Government maintains that Victim No. 5440536 (the "P.M." Revocable Trust) sustained a total loss of $881,268.00, the Defendant's analysis indicates that Victim "P.M." gave $0 to the RMA Fund but yet received a return of $14,732.00.

*The Money MONTOYA and the RMA Fund Returned to the Victims*

After determining the amount of money an individual investor gave MONTOYA and the RMA Fund, the Government then subtracted any money that the investor withdrew from the RMA Fund and/or received from MONTOYA and the RMA Fund as either a redemption, withdrawal or purported return on their investment. To be sure, under the applicable commentary to USSG § 2B1.1 ("Credit Against Losses"), "[l]oss shall be reduced by . . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." USSG §2B1.1, comment. (n.3(E)(i)).

The result of this analysis left three categories of investors: (1) individuals who gave money to MONTOYA and the RMA Fund and received nothing in return; (2) individuals who

4

gave money to MONTOYA and the RMA Fund and got back less than they put in; and (3) individuals who gave money to MONTOYA and the RMA Fund but actually got back more money than they invested; that is, they made a profit.

In this case, as matter of loss determination, the handful of individuals who received more money back from the RMA FUND than they put in, did not sustain an actual pecuniary loss. In other words, their loss is $0 and does not add to (or subtract from) the total amount of loss. As depicted in Exhibit A,[2] the aggregate of each of the true victims' individual losses is the total amount of loss, totaling more than $38 million.

The Defendant's analysis turns the proper Guideline analysis on its head. When an individual investor actually made money – that is, got back more from the RMA Fund than they put in – the Defendant argues that the investor's profit should be credited against the total amount of loss that the victims sustained. Specifically, the Defendant alleges that $9,707,821 –the total amount of money that investors actually got in excess of their investment - should be deducted from the total amount of loss he caused the victims in this case.

The Defendant's analysis if fundamentally flawed. While it is true that "[l]oss shall be reduced by . . . [t]he money returned . . . by the defendant . . . to the victim[,]" the individuals who made more money did not suffer a pecuniary loss and thus are not victims for the purposes of § 2B1.1 loss calculations. Otherwise, under the Defendant's logic, a single investor's net earnings, if greater than the sum total of the victims' losses, could result in zero loss to all the victims. Compare United States v. Stepanian, 570 F.3d 51, 56–57 (1st Cir. 2009) (a victim's who sustains a loss, but whose losses are "reimbursed" is still a victim for the number of victim's enhancement). More fundamentally, instead of focusing on the actual loss to a victim of the

---

[2] Exhibit A and B are redacted. Un-redacted versions are being filed with the Court under seal.

crime, the Defendant analysis is more of a fund-wide analysis that looks at the aggregate gains and losses.

Moreover, the Defendant's position directly contradicts the commentary to the U.S. Sentencing Guidelines. As the commentary to Section 2B1.1 makes plainly clear:

> In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme)
>
> USSG 2B1.1 comment n. (3(F)(iv)).

The Defendant's reading of this straightforward comment misses the point, especially when the Sentencing Commission's commentary is to be "read in a straightforward, commonsense manner." United States v. Carrasco-Mateo, 389 F.3d 239, 244 (1st Cir.2004). To repeat the above, "the gain to an individual investor in the scheme shall not be used to offset the loss *to another individual investor in the scheme.*" USSG 2B1.1 comment n. (3(F)(iv)) (emphasis added). That is exactly what the Defendant is seeking to do - adding up the gain from 24 individual investors who made money (including one who profited more than $4.6 million) and seeking to subtract that amount from the total loss among the victims.

Finally, the Defendant's argument that the Note 3(F)(iv) does not apply because the RMA Fund was not a true Ponzi scheme also misses the mark because this case clearly involves a "fraudulent investment scheme." The language "such as" a Ponzi merely provides an example of a type of fraudulent investment scheme. Furthermore, while not every payout to investors was funded by new investor money, as typical in a Ponzi scheme, at times the RMA Fund could be fairly characterized as a Ponzi scheme.[3]

---

1. For example, as detailed in paragraph 17 of the PSR, between December 28, 2016 and February 28, 2017, while MONTOYA received over $3 million of investor funds into the RMA Fund Citizens Account, only approximately $1.8 million was transferred to any of the RMA FUND's E*Trade brokerage

*Even under the Defendant's Numbers, the Total Amount of Loss is More than $25 Million*

As further summarized in Exhibit A, while the Government steadfastly contends that the total amount of loss is precisely $38,745,148.37, the Defendant's total numbers (without applying a $9.1 million deduction for the net winners) is still above $25 million ($26,485,582.60). See Exhibit B (Defendant's Loss Calculation).

Furthermore, while the Government will seek an order of restitution consistent with Exhibit A, the Court has discretion to make a latter determination of restitution. The Mandatory Victims Restitution Act ("MVRA") requires defendants convicted of fraud and other crimes against property to pay restitution to those "directly and proximately harmed" by the offense. 18 U.S.C. § 3663A(c)(1)(A)(ii). The amount of restitution must equal "the full amount of each victim's losses . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). In any event, "[i]f the victims losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." 18 U.S.C. § 3664(d)(5).

Accordingly, the Government maintains that the Court should find that the total amount of loss is at least $25 million, resulting in base offense level 29.

**B.      Sophisticated Means Sophisticated Means Enhancement**

The Defendant contests the sophisticated means enhancement. Section 2B1.1(b)(10)(C) of the U.S. Sentencing Guidelines provides for a 2-level increase of the offense level when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or

---

accounts and invested. During the same period, MONTOYA used more than $1 million of this new investor money (1) to pay over $600,000 in redemptions to earlier investors, (2) to fund approximately $420,000 in checks to MONTOYA's sons and MONTOYA's spouse, and (3) to pay approximately $8,900 to his home equity line of credit.

caused the conduct constituting sophisticated means[.]" USSG § 2B1.1(b)(10)(C). Application notes 9(B) further provides that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" and cites as an example the use shell corporations in a telemarketing scheme. USSG § 2B1.1, n. 9(B). However, "[t]he list in the commentary of conduct that warrants the enhancement is not exhaustive." United States v. Pacheco-Martinez, 791 F.3d 171, 179 (1st Cir. 2015). "The defendant need not have done any of the things listed in order to qualify for the enhancement, so long as the offense as a whole shows "'a greater level of planning or concealment' than a typical fraud of its kind." Id. citing United States v. Knox, 624 F.3d 865, 870–72 (7th Cir.2010) (quoting United States v. Wayland, 549 F.3d 526, 528–29 (7th Cir.2008)).

Contrary to Defendant's assertions, MONTOYA's execution of the offense went well beyond "very basic means." See Defendant's Sentencing Memorandum at pg. 15. The entire operation was cloaked with sophisticated means. Even though the Defendant failed to admit it during his consensual interview (leading to the execution of a search warrant at his residence after his consensual interview), the real work of the RMA Fund was done by MONTOYA at his residence in Allston, Massachusetts. In fact, MONTOYA only went to the office a couple times a year when potential investors paid a visit. See PSR ¶ 39.

The brochures and written materials that touted the RMA Fund's success – from the sophisticated, propitiatory software it used; the outside auditor (Thomas Zazzarra)[4] it employed to verify its' financial condition; and the respective role and expertise of its employees (like George Bedarf) – was truly an intricate façade. Most significantly, the Defendant manufactured realistic looking account statements that he carefully and meticulously created by dictating the numbers to

---

[4]See PSR ¶ 14.

George Bedarf, an administrative assistant who spent more time running personal errands for MONTOYA than investment research.

With these facts, it is clear that the execution of the Defendant's scheme involved a greater degree of planning and sophistication than a normal investment fraud scheme.

**C.    Advisory Sentencing Guideline Range**

The resulting offense level is thus 29 (base offense level for loss greater than $25 million, but less than $65 million) + 4 (for substantial hardship to 5 more victim) +2 (sophisticated means) + 4 (acting as financial advisor) + 1 (Section 1957 conviction) = 40.  After a 3-level reduction for acceptance of responsibility, the total offense level is 37, with an advisory sentencing guideline range of between 210-262 months.  Since the statutory maximum is 20 years, the high end of the applicable GSR is lowered to 240 months.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

Section 3553(a) of Title 18 specifies the factors courts are to consider in imposing a sentence and instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation.  18 U.S.C. § 3553(a).  Section 3553(a) then directs a sentencing court to take into account "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to serve the four overarching aims of sentencing. §§ 3553(a)(1), (2)(A)–(D); see Gall v. United States, 552 U.S. 38, 50, n. 6 (2007). The court must also consider the pertinent guidelines and policies adopted by the Sentencing Commission. §§ 3553(a)(4), (5); see id., at 50, n. 6.

**A.    The Nature and Circumstances of the Offense**

The instant offense was a particularly pernicious investment fraud scheme that will have lasting effects for dozens of families spread across Massachusetts, Ohio and California.  For

many of the victims, MONTOYA literally stole their entire lifesavings they worked a career and lifetime to build for their children's education and their own retirement. The scheme was particularly pernicious because of the very personal way MONTOYA deceived his victims. He came into their homes, became part of their families and even employed one of the victim's children as an employee at the RMA Fund in Boston, Massachusetts.

As detailed in the victim impact statements, some of which are quoted below, in addition to devastating financial consequences, each of the victims have expressed a feeling of shame and depilating depression because of MONTOYA's offense:

> VIN 5420317:
> I am a single woman in my mid-40's. I was recently laid off and was forced to go on disability after my entire savings were stolen by this man, which totaled 740,597.73. I have worked hard for the last 22 years as a pharmacist and he took every penny to my name. . . My retirement is wiped out as well as my entire personal savings.

> VIN: 5440514; 5440517:

> loss. Because of the reassurance of Raymond Montoya and the history of his so called "steady safe returns", I put the bulk of our life savings and both         and my IRA accounts into his hands. Unfortunately, I trusted him with my future. I am currently 65 years old and was planning on retiring next year at the age of 66. I wasn't going to retire because I wanted to, I was going to retire to take care of my wife of 43 years who is suffering from Alzheimer's and is almost to the point where she can't be left alone. I now must continue to work to afford my house along with the daily costs of living to get by.

> VIN: 5440522 and 5440521

> Both my wife and I went into a severe depression. I could hardly work thinking our futures would be significantly different from what we had planned. Our life savings were gone. Our financial security was gone. Any plans of normal retirement had been taken away because of the fraud perpetrated by Raymond Montoya. We had invested our life savings and never took a single withdrawal from the RMA fund.

> VIN: 5440572

> I am now 60 years old and we have been forced to completely rethink what will be our final chapter . . . There are no words to describe the devastation this time around. Mentally, physically and financially I/we will never be the same.

> VIN: 5440585

To say I've been depressed is an understatement, and I am unable to trust anyone. I am ashamed that I was tricked and that I put so much faith in a "friend," and that I am foolish to have fallen for this con man.

VIN: 5440588

My husband is 71 and I am 64 years old. He is retired and he is working part time and he will continue to do so as long as it is possible. I am not planning to retire since I am the only one who supports the household now. As long as I am healthy I will continue to work until the end. Eventually we might have to relocate since our house is costing us $8,000 in taxes per year, and that is not our only expense. Now, about the emotional turmoil, I cannot find the words to describe our condition.

VIN: 5440594 and 5440590

Upon learning that we were victims of a con man and crook we immediately put our plans on hold. Without any savings or retirement we realized there was absolutely no way we could afford retirement.

VIN: 5440607

Not only will I not retire for many years to come, at least a decade, I had to beg, borrow and literally plead to my daughter's paternal grandparents to pay for her college tuition in 2017.

VIN: 5440599

Raymond did this after insinuating himself in my family's lives and building trust over several years.

For the most part, the facts are not dispute. MONTOYA told the victims that he was investing their money and was advertising huge rates of return that were just not true. See PSR ¶ 12. MONTOYA did not have sophisticated, proprietary software (PSR ¶ 13); he did not have an outside auditor/fund administrator (PSR ¶ 14); he did not use JP Morgan Chase as his "prime broker" (PSR ¶ 15); and that the money he claimed was in their retirement/investment accounts was only a fraction of what they actually had. To this day, some of the victims have a difficult time comprehending that the monetary amounts they saw their monthly account statements were never really there.

11

Most importantly, in addition to his fraudulent inducements, at times MONTOYA just stole money from the victims. In 2011, even before he started losing their money, MONTOYA used approximately $200,000 in investor money to pay for his children's home loan and another $100,000 for a down payment on a 2010 Rolls Royce. By 2012 the RMA Fund was losing money and by 2015 the losses were substantial, but yet the stealing continued. As detailed in paragraph 43 of the PSR and the assets identified in the plea agreement and criminal information, MONTOYA used investor money to purchase high-end vehicles (including a Lamborghini, Rolls Royce, three Ferraris and three Porsches) and to pay for his children's student loans and personal home mortgages. Contrary to the Defendant's assertions that he was hoping to "trade his away" out of the deficit (see Defendant's Sentencing Memorandum at pg. 6), none of these expenditures had anything to do with a plan to recoup his victims' funds. It was just selfish greed.

On the other hand, as the Defendant correctly points out, MONTOYA took substantial steps to mitigate the harm he caused. After being sued by the Massachusetts Securities Division ("MSD") in June 2017, upon advice of counsel, MONTOYA agreed to admit to the offense and participated in a consensual interview without the standard protections of a profit letter. MONTOYA provided the FBI and IRS with detailed records and took steps to surrender the assets that had been purchased with investor funds. In fact, as depicted in Exhibit C, the Defendant has already surrender more than $9.4 million in cars, banks accounts, and other property, approximately 25 percent of the $38 million loss that he caused.

Under the terms of the plea agreement, the Defendant also has the obligation to forfeit eight additional vehicles worth approximately $373,000. Furthermore, as the Defendant correctly points out, in addition to the instant case, the Defendant has cooperated with a bankruptcy trustee appointed in Boston and together with one of his son's and his daughter has surrendered (or agreed to surrender) another $900,000 in funds to the trustee. The Defendant's substantial efforts

to quickly accept responsibility and mitigate the damage of his offense should be considered. The Court's sentence should reflect these efforts.

Nevertheless, while the Defendant has taken significant steps to mitigate his offense, the breadth of his remediation is overstated. First, while it is true that the Defendant (through his counsel) reached out to the U.S. Attorney's Office to admit his offense, he only did so after untruthful sworn testimony to the MSD and a subsequent lawsuit that exposed the crime. Second, while the Defendant participated in a consensual interview in June 2017, during the interview he gave the FBI and IRS the incorrect impression about the primary locale for *his* work at the RMA Fund. During the interview, MONTOYA neglected to mention that most of the work he did was done - and a large number of the records were actually located at - his residence and not at the RMA Office's in Boston. In fact, MONTOYA rarely if ever even went to the RMA Fund's Offices. As a result, the FBI conducted a search warrant of the Defendant's residence in August 2017, and seized cash, computers, records, and some valuable jewelry.

**B.      The History and Characteristics of the Defendant**

The Defendant is a 71-year old college graduate with a wife and professionally successful adult children. He was born in the Philippines and came to the United States in 1968. At the age of 40 in about 1988, MONTOYA was prosecuted for embezzlement in Los Angeles and was sentenced to more than 5 years of state incarceration. Because of its age, the conviction does not count toward any enhanced criminal history score, but similar to the instant offense, involved stealing funds that did not belong to him.

**C.      The Need for Sentence Imposed – to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

In considering the appropriate sentence, the Court should strike a balance between first, the utterly devastating effect of his crime; and second, the efforts MONTOYA has made to admit the

offense and mitigate the financial damage.[5] While the Court can and should consider the Defendant's substantial efforts to admit to the offense and mitigate its' damage, the efforts cannot totally wipeout the damage and the seriousness of the offense.

Admittedly, a just punishment should also take into the account the fact that the Defendant is 71 years old. Any sentence of more than 10 years would leave the Defendant on supervised release well into his mid-80's.

**D.     The Need of the Sentence – to Afford Adequate Deterrence and Protect the Public**

Lastly, the sentence should promote deterrence. While the chances that MONTOYA would re-offend are slight, based on his advanced age, deterrence also includes general deterrence. See eg., United States v. Crespo-Rios, 787 F.3d 34, 38 (1st Cir. 2015) ("Critically, there is no explanation of how this sentence reflects the seriousness of the crimes committed, avoids sentencing disparities, promotes general deterrence, or promotes respect for the law"). The commission of an offense that generates a loss of $38 million dollars and wipes out the lifelong retirement savings of a large number of families deserves a significant punishment.

---

[5] While far from a perfect measure, voluntarily surrendering 25 percent of the loss amount, if applied to a 25 percent reduction in the sentence, would reduce a sentence of 210 months to approximately 157 months (about 13 years).

## CONCLUSION

For the foregoing reasons, the Government submits that the Court should sentence the defendant, RAYMOND K. MONTOYA, to a term of incarceration consistent with the U.S. Sentencing Guidelines.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/ *Neil Gallagher*
Neil J. Gallagher, Jr.
Assistant U.S. Attorney

Date Submitted: March 18, 2019

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Neil J. Gallagher, Jr.*
Neil J. Gallagher, Jr.